We'll move to our second case this morning, Horr v. Berryhill. Mr. Rodman.  Your Honor, my name is Jason Rodman. I represent the appellant, Sharon Horr. I'd like to reserve three minutes for rebuttal. I'll start by pointing out that the notice of decision unfavorable that's relevant today actually starts at AR 543. They stick it towards the middle. Horr applied for Title II disability, was denied at Step 5 with the allegation that she would work as a sorter, inevitably using her hands, hand pactor, and an inspector, all inevitably using her hands. She had a date last insured that was remote. It was November 30, 2011, and so she needs to show that she's disabled by that date. This is only disability insurance benefits, not SSI? That's right. Okay, thanks. And so there are two main arguments here, and I'm going to break them up a little bit differently this morning for the sake of illustration. First, the ALJ fails to include the RFC impairments in combination. And second, the ALJ fails to basically analyze pain properly, and that shows up through the way the ALJ analyzes the different physician opinions, specifically granting less weight to the pain management doctor for using pain management techniques and otherwise mischaracterizing it in a way that's inaccurate the orthopedic record as if it consistently discounts other non-orthopedic explanations or causes. I'm going to talk a little bit about the failure to analyze impairments in combination first, but then that's going to be a point to which I come back to later in the discussion today. Some of the prime ways that the RFC impairments in combination are not accounted for are upper extremities and neck pain, at least flare-ups that limit sitting to only short periods of time, and credence to the extent of migraines. For the sake of illustration and focus today, I'm going to focus on the upper extremity element. And then in general regarding RFC impairments, and in this case here in the way the ALJ makes mistakes analyzing the opinions and the data, if you look at AR 561 in the opinion, and I believe I'm quoting here, the ALJ claims that Haar's statement about her limitations, quote, far exceeds the objective medical evidence. And then it goes on to say that this fact weighs against, according to her, more than minimal weight. To me, just on the face of it, she's assigned by the ALJ opinion a reduced range of sedentary. And so to say that she's alleging that she's just barely over that line and disabled, to me, that just on the face of it doesn't follow the logical bridge, because she's not far alleging that she far exceeds that very minimal on the edge RFC. But I want to get into the specifics for you this morning. And I want to talk about a couple of different things in the time period, because the sequencing is really important here. So Dr. Shugart's record has interfaced with pain management, and he's the orthopedic doctor, if you remember. It's interfaced and supported pain management almost from the get-go. Dr. Shugart seems to be a surgeon who picked up from Zolman, who's a pain management doctor. That's at AR 491 to 493, and then had a couple visits just leading up to a L5 to S1 fusion. So that's the lowest part of his heart's back fused together. And then after that swoops in, and this is at AR 485. This is an important site, because swoops in after the ACDF and concludes, quote, no restrictions and just a little checkbox. And then that is alongside a referral to pain management, right? And then shortly after that, less than a month later, Dr. Shugart then decides that, oh, in fact, there apparently aren't no restrictions, because she needs an ACDF, which is where they go in from the front and do the fusion on the neck vertebra. And then after that occurs, Dr. Shugart refers to the pain management people who did the injection to the neck, or I guess as that occurs, the same day, and says, quote, we did an injection without relief. So Dr. Shugart and the pain management people are interrelated. It's a whole treatment thing. But Dr. Shugart's record also shows ongoing upper extremity problems. So I'm going to try and focus here for the sake of time. Mr. Rodman, could I just ask you, in terms of the administrative law judge's decision about residual functional capacity, could you direct us to medical opinions imposing tighter limits or functional restrictions on Ms. Hoare than the ALJ did? Yes. By way of introduction, very briefly, it was Dr. Smarts, the non-examining consultant at 22F, that the ALJ bases the opinion on. And that's immediately following the AR483, Dr. Shugart's PA checking off that no restrictions box. But then immediately following that, the next month, Dr. Roth, the pain management doctor, starts treating. And he says that the neck surgery and back surgery were failures. In my mind, that amounts to a medical opinion. Well, let me ask my question again, and please answer it as specifically as you can. Did any doctors impose restrictions on standing, sitting, walking, other activities that are inconsistent with full-time work? There is the sitting issue that I referenced in the briefing. But there's also the issue that's inconsistent with full-time sedentary work, as it's alleged in the RFC, which goes to the upper extremity limitations. And, you know, like I said at the beginning, the ALJ said that, and I'm going over it. I'm going to ask again. Specific doctor opinions about functional restrictions that are inconsistent with the RFC, as found by the ALJ. Yes. That would be on January 4, 2012. Dr. Roth said that pain still radiated to her shoulders and bilateral arms. He had positive tests across various upper extremity functions things, with decreased range of motion across all planes, and trigger points found showing painful range of motion. And so that shows upper extremity limitations, but there aren't any upper extremity limitations in the RFC. And I'd like to reserve time for rebuttal if you don't have any more questions or if I've answered that sufficiently for now. That's fine. Thank you. Mr. Neltner. May it please the Court, Andrew Neltner on behalf of the Acting Commissioner. The answer to your Honor's question is no. There is only one doctor that provides any functional limitations whatsoever, and that is Dr. Smart. Dr. Smart is a reviewing physician on behalf of the state agency. Dr. Smart imposed a number of limitations on the appellant. The ALJ took those limitations and found that further limitations were needed. Could you address the issue about upper extremity limitations, which didn't seem to be addressed in the ALJ's determination of residual functional capacity? Yes. So Dr. Smart, when he reviewed the record, imposed no reaching limitations whatsoever. The ALJ likewise did not impose any reaching limitations. The ALJ discussed the various issues with the claimant's upper spine and her back, which relates to reaching and handling and things of that nature. The ALJ also discussed her problem with her right hand and her wrist and evaluated the evidence in that regard. But the ALJ took all of that evidence and concluded that reaching limitations were not required. And Dr. Roth, whose opinions were not sufficiently taken into account in the first hearing, that was the purpose of the remand, to consider those in greater depth. But although he found range of motion reductions at various points in time, as a pain management physician, he never issued any limitations. That is correct. On account of those periodic reduced range of motion problems. Is that an accurate statement of his testimony? That was my question. Sorry, that is an accurate statement. And that's how the new ALJ, who took a fresh look at this entire record, analyzed his and read his opinions and his treatment records. That is correct. When the ALJ looked at the issues of range of motion, the ALJ took attention of the full scope of the record. And there are definitely parts in the record where doctors have noticed range of motion limitations, especially with the neck and upper spine. You'd expect that with her lengthy medical history and procedures. She's got several vertebrae fused, right, in the neck? That is correct. Regardless, there are also doctors who found repeated no range of motion limitations. And there are doctors who consistently found full strength in her upper body and her extremities. And the ALJ did what she is tasked to do. She weighed that evidence. It wasn't clear cut. It wasn't all one way or the other. But the ALJ took the evidence, the issues of the range of motion, a clear opinion from Dr. Smart in posing no limitations in reaching, and the ALJ arrived at a residual functional capacity that took an otherwise healthy, at the time of her date last insured, 40-year-old woman and found that all she could do was a job where she could sit. Turning to some of Appellant's arguments in their brief, Appellant claims that the ALJ relied on lack of objective medical evidence in discounting her allegations. And I would ask the court, if it reads the ALJ's decision, does it think that the ALJ thought she was in pain? Because the answer, I think, is unequivocal. The ALJ clearly thought that she was in pain. And if that is the case, then the ALJ did not rely solely on objective medical evidence. Because in this record, there is no objective evidence of pain. So in terms of Appellant's argument in their brief, that the ALJ overreached and overrelied on objective medical evidence, that is clearly not the case. The ALJ also relied on the plaintiff's, excuse me, on the Appellant's own doctors. The doctor that was given the most weight in this case is Dr. Sugar, the one who had the longest longitudinal relationship with the Appellant. That doctor performed two surgeries on the Appellant, saw the Appellant repeatedly. That doctor didn't impose any functional limitations. As a matter of fact, after Appellant had her next surgery, which was about two months before her date last insured, which is the date by which her disability has to begin, shortly after that surgery, Dr. Sugar's physician's assistant imposed no restrictions whatsoever. This is at the record, page 415. At the bottom it says, no restrictions. At the top, when it's discussing her condition, it says, posterior head pain has resolved. This is what the ALJ relied on in fashioning the residual functional capacity. But it's not just that note from Dr. Sugar's physician's assistant. There are other doctors and other notes from Dr. Sugar. On record, page 481, Dr. Sugar notices that six weeks post-op, Appellant was feeling better. As a matter of fact, he says, quote, she is doing quite well. In those reports after surgery, though, it's usually compared to what, right? That is the question, as compared to what. You may not be ready to go back to work six weeks after spinal surgery, et cetera. But I don't necessarily know that a whole lot of weight is due to those sorts of general statements. That's why I was asking more specifically about doctors' opinions about functional restrictions. Right, I understand. And that's obviously a valid concern, especially longer after surgery, how is someone doing? Well, if you look at Dr. Sugar's note from September of 2012, which is a year after the surgery, almost a year after her date last insured, doctor says, Sharon returns today. She is about a year from surgery, overall doing fairly well. Now, he goes on to say she's actually still having pain. And the ALJ didn't ignore those records or notations. Again, we have an otherwise healthy 40-year-old individual that is found to only be able to do seated work. I'm sorry, otherwise healthy. Well, I'm saying as compared to the benchmark of someone who didn't need disability. She had numerous impairments. Yeah, following severe impairments, you know the list, right? It goes on quite a ways. Yes. Okay. Yeah, I didn't mean to, by any means, mislead the court. I just mean compared to someone who is not applying for disability, a normal individual who can do the full range of work was only my point of comparison. Counsel, I want to direct your attention to the second ALJ incorporating by reference the appellant's testimony from the first hearing. Yes. Now, obviously at the second hearing, the second ALJ is able to assess credibility. But when the second ALJ is incorporating that testimony, is there any commentary in the record about the credibility, including whether or not the second ALJ, in the incorporation by reference of the petitioner's testimony from the first hearing, was commenting on that or was it just a substantive incorporation by reference? For the most part, it appears to be a substantive incorporation, in that the ALJ in the decision at issue is saying that previous ALJ's assessment of the record in certain regards comports with what I see is in the record, so I'm going to incorporate that by reference. There are points where the ALJ in the current decision actually seems persuaded by or in line with some of the reasoning of the first ALJ, and this specifically has to do with some of the mental limitations, because the mental examiners found that there were only mild, mostly mild limitations in things like activities of daily living, etc. The first ALJ thought that some of those shifted to moderate. The second ALJ said, I agree with the ALJ's analysis over here, that those actually, some of them shift to moderate. In terms of mental limitations, though, those are not at issue in this case, but that was sort of the interplay between the two decisions in the ALJ's discussion of the testimony and prior case. If I answered your question. Yes, thank you. In short, what we have here is an ALJ that did not overly rely on objective proof of pain, actually found and believed that the appellant was in pain, just not as severely as she would have liked. Relied on the doctors that did give functional limitations, that is Dr. Smart, and then reached a reasoned conclusion relying on substantial evidence to fashion the residual functional capacity that took into consideration the evidence that showed she had serious problems, but also the evidence that showed they weren't as bad as she alleged. If there are no further questions, the government rests. Thank you. Mr. Radman, rebuttal. Your Honors, I'll try to be brief. I would first point out that as opposed to Dr. Smart, with which the Commissioner raises, Dr. Broth is a treating physician who pointed to the pain still radiating to the shoulders and arms. Second, I want to draw attention back to the sequence. And so first at 483, Dr. Shugart's PA not only said no restrictions, but threw in like gentle range of motion and limit limitation, which makes me wonder if Smart's, you know, thereafter subsequent 83011 at 22F was accurate in its own sake. But in any case, I want to draw, you know, thereafter is when the Dr. Broth treatment records come up again. And I want to point to specifically AR472, which is where Dr. Broth didn't just make diagnosis. He didn't just make conclusions and opinions that the neck surgery failed and the back surgery failed, which I think are not things that a doctor says lightly. But he also makes actual cervical faucet injections. And to me, that draws parallels to what happened in the Karadine case, which is where this court said things like, well, you know, is the claimant really faking it to get all this treatment, this real substantive treatment, and the doctor is really doing things that wouldn't make sense like that. And then finally, very briefly, I would point to the chronic pain syndrome, which is talked about in the brief, how there's a psychological component. And I would add, you know, she's got major depression. And so some of the critiques as to her treatment or her follow up might be partially explained by that. I don't have anything more unless you have questions regarding that. All right. Thank you. The case is taken under advisement.